# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3830

_____

| | | |
|---|---|---|
| Ellen Maria Reasonover; Charmelle Bufford, | * | |
| | * | |
| | * | |
| Plaintiffs/Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Missouri. |
| St. Louis County, Missouri, | * | |
| | * | |
| Defendant/Appellee, | * | |
| | * | |
| City of St. Louis, Missouri; | * | |
| St. Louis Police Department, | * | |
| | * | |
| Defendants, | * | |
| | * | |
| St. Louis Board of Police Commissioners, and individual members of the board, | * | |
| | * | |
| | * | |
| | * | |
| Defendants/Appellees, | * | |
| | * | |
| Homer Sayad, individually and in his official capacity as a member of the Board; Charles Valier, individually and in his official capacity as a member of the Board; Robert Wintersmith, individually and in his official capacity as a member of the Board; Thomas Purcell, individually and in his official capacity as a member of the Board; Vince Schoemehl, individually and in | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |
| | * | |

his official capacity as a member of the   *
Board,   *
  *
          Defendants,   *
  *
Maurice Nutt, in his official capacity as   *
a member of the Board; Edward Roth,   *
in his official capacity as a member of   *
the Board; Mark Smith, in his official   *
capacity as a member of the Board;   *
Leslie Bond, in his official capacity as   *
a member of the Board; Francis Slay,   *
in his official capacity as member of the   *
Board,   *
  *
          Defendants/Appellees,   *
  *
City of Dellwood, Missouri,   *
  *
          Defendant,   *
  *
City of Jennings, Missouri,   *
  *
          Defendant/Appellee,   *
  *
Daniel Chapman, individually and in   *
his official capacity as a police officer   *
for the City of Dellwood, Missouri,   *
  *
          Defendant,   *
  *
Dennis Welling, individually and in his   *
official capacity as a police office for   *
the County of St. Louis, Missouri;   *
James Eichelberger, individually and in   *
his official capacity as a police officer   *
for the City of St. Louis; Frank   *

-2-

Banaszek, individually and in his     *
official capacity as a police officer for   *
the City of St. Louis, Missouri; Kenneth *
Tillman, individually and in his official   *
capacity as a police officer for the City   *
of St. Louis, Missouri; Richard         *
Needham, individually and in his       *
official capacity as a police officer for   *
the City of Jennings, Missouri; Robert   *
Pruett, individually and in his official   *
capacity as a police officer for the City   *
of Florissant, Missouri,               *
                                    *
        Defendants/Appellees,   *
                                    *

David Doctor, individually and in his   *
official capacity as a police officer for   *
the County of St. Louis, Missouri,     *
                                    *
              Defendant,         *
                                    *

Steven Goldman, individually and in   *
his official capacity as a prosecutor for *
the County of St. Louis; John Tek Lum, *
individually,                     *
                                    *
        Defendants/Appellees.   *

_____

Submitted: October 10, 2005
Filed: May 8, 2006
_____

Before RILEY, HANSEN, and COLLOTON, Circuit Judges.
_____

RILEY, Circuit Judge.

-3-

Ellen Maria Reasonover (Reasonover) was convicted in 1983 of killing James Buckley (Buckley).  Reasonover served over 16 years in prison, and was released in 1999 after her petition for writ of habeas corpus was granted.  The habeas court found, in light of new evidence discovered and disclosed after Reasonover's conviction, it was more likely than not that no reasonable juror would have found Reasonover guilty beyond a reasonable doubt.  Reasonover v. Washington, 60 F. Supp. 2d 937 (E.D. Mo. 1999).  Reasonover and her daughter, Charmelle Bufford (Bufford), now bring an action under 42 U.S.C. § 1983 and Missouri state law against many of the individuals and municipalities responsible for her conviction and incarceration.  Their claims include (1) a section 1983 claim for malicious prosecution, false arrest, use of unreliable and fraudulent investigatory techniques, procurement of unreliable and fabricated evidence, and wrongful conviction and imprisonment; (2) a section 1983 claim for conspiracy; (3) a section 1983 claim for suppression of exculpatory evidence; (4) section 1983 claims against municipalities and counties for failure to train police officers; (5) a section 1983 claim for deprivation of associational rights and loss of family privacy; (6) a claim under Missouri state law for negligence resulting in wrongful incarceration and continued detention; (7) a state law claim for false arrest; (8) a state law claim for malicious prosecution; and (9) a state law claim for abuse of process.  The district court[1] granted all of the defendants' separate motions for summary judgment, and Reasonover and Bufford appeal.  We affirm the district court.

## I.    BACKGROUND

On January 2, 1983, Buckley was shot to death at the Vickers gas station in Dellwood, Missouri, a northwest suburb of St. Louis.  The City of Dellwood requested the assistance of the St. Louis Major Case Squad (MCS), which was operated as a consortium by a group of local police departments.  The MCS assigned to the

---

[1]The Honorable Carol E. Jackson, Chief Judge, United States District Court for the Eastern District of Missouri.

investigation more than two dozen officers from several police departments in the area, including the City of St. Louis, St. Louis County, the City of Dellwood, and the City of Jennings, and then appointed as commander Dellwood Police Department Captain Dan Chapman (Captain Chapman).

The MCS publicly encouraged persons with information to come forward. On January 3, 1983, Reasonover, using a false name, contacted the police claiming she had been at the Vickers station around the time of the murder. The next day Reasonover spoke to Captain Chapman. Reasonover told him she had seen a car leaving the station, and she had seen a black man in the cashier's cage at the station. When she approached the cage, the black man took off his cap and went into the main part of the station. Reasonover also saw another light-complected black man at the station, and a third person sitting in the back seat of a car parked at the side of the building. The man from the cage got into the car and the car left the parking lot. Reasonover went to a nearby 7-Eleven store where again she saw the three men as she was exiting the store.

Reasonover agreed to come to the police station where she revealed her true identity. The police showed Reasonover about 250 photographs of black males, and she identified two men–Isaac Scott (Scott) and Herman Staples (Staples)–as the men she saw at the Vickers station. In a live lineup she identified Staples, but not Scott. The police later learned both Scott and Staples were in jail at the time of the murder. The police also discovered Reasonover had recently complained to the police about an ex-boyfriend, Stanley White (White), who had broken out her car windows, then driven away in a vehicle similar in description to the one she described as being at the Vickers station. The incident took place only a few days before the murder.

When police told Reasonover the men she identified could not have committed the murder, Reasonover agreed to try to get the name of the third man, whom she

thought she and her friend had seen at parties. Reasonover called the police and identified the man as Willie Love (Love), and she later picked Love out of a lineup.

On January 6, the police arrested White. During his interview with the police, and on the Reasonover-White Tape, see infra, White stated he was with the Weston family the night Buckley was killed. Police officer Robert Pruett (Officer Pruett) interviewed the Westons, and wrote a report stating the Westons said they had not seen White for more than a week before the murder. Later, during Reasonover's habeas proceedings, two of the Westons stated Officer Pruett's report was incorrect.

On January 7, the police arrested Reasonover. Officers Frank Banaszek (Officer Banaszek) and Dennis Welling (Officer Welling) questioned Reasonover regarding her complaint about White and her activities from December 31, 1982, to January 3, 1983. Officer Banaszek's report of the interview stated Reasonover repeated a sequence of events at least six times, but only once mentioned she had been at the Vickers station on January 2. Reasonover now claims this report is false because it fails to include her numerous denials of involvement in Buckley's murder.

The police placed Reasonover in a cell next to White in the Dellwood jail. Reasonover and White could hear but not see each other. Reasonover and White engaged in what they thought was a fifty-six-minute private conversation, but the police had planted a recording device in the area between their cells. The taped conversation (Reasonover-White Tape), as Reasonover accurately states in her brief, "reflected that Reasonover and White were bewildered by their arrests, knew nothing about the crime, and were confident they would soon be released because police would realize they had made a mistake."

The Reasonover-White Tape was not transcribed, logged, or made the subject of any police report, and no officer has admitted making the recording or accepted responsibility for the tape. The state's prosecutor, Steve Goldman (Goldman), later

admitted (1) he did not disclose the tape to Reasonover's counsel, claiming he did not know it was in existence after Reasonover was charged because police officers told him the conversation had been taped over; and (2) officers told him the tape contained nothing of substance. Also later, Officer Welling said he and several other officers listened to the tape. Officer Welling described the tape as a "wash," so he did not document the tape in a report. Detective James Eichelberger's (Detective Eichelberger) name and the date 1-7-83 appeared on the tape's label on the side of the Reasonover-White conversation. On the opposite side was recorded an interview with another witness, Valerie Clark, on January 9, 1983. On that side of the label were the names of Detective Kenneth Tillman (Detective Tillman) and Officer Banaszek. Detective Eichelberger, Detective Tillman, and Officer Banaszek all later denied being involved with the jailhouse taping of the Reasonover-White conversation. The tape was finally found in an envelope with a label reflecting the Valerie Clark interview, but not the Reasonover-White conversation, and the tape was released in 1996 during Reasonover's habeas proceedings.

Later on the evening of January 7, the police took Reasonover to the Jennings jail, where they placed her in a cell with two women, Marquita Butler Hinton (Hinton) and Rose Jolliff (Jolliff). In the morning, the police, including Detective Eichelberger, Detective Tillman, and Officer Richard Needham (Officer Needham), took a statement from Jolliff, who stated Reasonover confessed to Jolliff in the presence of Hinton that she committed the murder with White and Robert McIntosh (McIntosh). Jolliff and Detective Eichelberger discussed Reasonover's boyfriend's name (White) and the weapon used to commit the crime (a rifle). The interview transcript contains a misstatement of fact by Jolliff, that Reasonover had a son rather than a daughter, mimicking a similar misstatement in a prior police report.[2] When later questioned at Reasonover's habeas hearing, Jolliff invoked the Fifth Amendment. Hinton, who also

---

[2]Reasonover also claims the transcript contains another misstatement by Jolliff, that Buckley had been beaten with the butt of a rifle.

had been in the cell, was interviewed by Goldman. She later stated she never heard Reasonover confess, and the police threatened her and offered her money if she would say Reasonover confessed while in jail. Hinton later testified she ultimately decided it would be wrong to lie about Reasonover, so she did not cooperate with the police and she was never called to testify at the trial.

Police released Reasonover on January 8, 1983. On January 12, Jolliff telephoned Reasonover and allowed the police to secretly record the conversation (Reasonover-Jolliff Tape). During the conversation, Reasonover explained to Jolliff she had been helping the police by identifying suspects, but she never mentioned any details about the murder or her supposed accomplices. At some point Joliff spoke with Goldman and agreed to testify against Reasonover as part of a plea bargain.

On February 8, the police arrested Reasonover for another crime. The police placed Reasonover in a cell in the St. Louis County jail with several women, including Mary Ellen Lyner (Lyner). Police working independently on Lyner's case later brought Lyner to the prosecutor, Goldman, because Lyner told the police she had information about the Buckley murder. Goldman alone interviewed Lyner, and he did not investigate her lengthy criminal history. Lyner stated to Goldman that Reasonover confessed to her. It was later discovered Lyner made a deal for leniency in an earlier case, even though she denied doing so during Reasonover's trial.

Reasonover was charged with the capital murder of Buckley. The evidence against Reasonover was based almost entirely on Reasonover's supposed confessions to Jolliff and Lyner. Other evidence included testimony of two white customers who were present at the Vickers station and who came forward with information. One customer, Anthony Longo (Longo), identified McIntosh. The other customer, Kenneth Main (Main), tentatively identified White in a photographic lineup, then after his memory was refreshed in a hypnosis session with Dr. Jon Tek Lum (Dr. Lum), Main confidently identified White in a live one-man lineup. Officer Pruett had

accompanied Main to Dr. Lum's office for the hypnosis session. Dr. Lum later stated he had been approached by MCS to perform hypnosis, but he was not given any information about the identities of White or Reasonover before hypnotizing Main, he never obtained feedback from law enforcement regarding hypnosis sessions, and he did not concern himself with the results of the session, including his session with Main.

Reasonover was convicted in December 1983 and sentenced to life in prison without the possibility of parole for fifty years. Reasonover appealed her conviction, and her attorney later learned the police played the Reasonover-White Tape for Main before Main was hypnotized by Dr. Lum. The state refused to release the tape, claiming it was not exculpatory under Brady v. Maryland, 373 U.S. 83 (1963). The Missouri Court of Appeals affirmed Reasonover's conviction in part because of a lack of record evidence of the tape's content. State v. Reasonover, 714 S.W.2d 706, 713 (Mo. Ct. App. 1986).

Reasonover began habeas proceedings in 1996. The district court held a hearing on her various claims. The district court ultimately found the case against Reasonover was based almost entirely on testimony of Jolliff and Lyner, and their testimony was discredited by the contents of the Reasonover-White Tape and the Reasonover-Jolliff Tape. Reasonover, 60 F. Supp. 2d at 943, 954-57, 963. Having listened to the tapes, the district court concluded, based primarily on the two tapes, Jolliff's secret deal, and Lyner's false denial about her previous deal, it was "more likely than not that no reasonable juror would have found [Reasonover] guilty beyond a reasonable doubt," and the state's suppression of the evidence deprived Reasonover of due process. Id. at 963, 981 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). After serving over sixteen years in prison, Reasonover was released.

In 2001, Reasonover and Bufford[3] filed the present lawsuit. After addressing multiple motions to amend discovery and filing deadlines, the district court set June 2, 2003, as the deadline for filing summary judgment motions, and ordered the court would not accept any summary judgment motion from Officer Pruett before May 15, 2003 (Officer Pruett previously filed a motion for summary judgment on March 7). Officer Pruett filed his motion for summary judgment on May 20, 2003. Reasonover's response was due within thirty days. Reasonover filed a motion "to set [a] deadline" for response to Officer Pruett's motion, but because a deadline already had been set, the district court denied the motion. On June 27, Reasonover filed a motion seeking more time to respond to Officer Pruett's motion. On July 11, the district court denied Reasonover's motion and granted Officer Pruett's motion for summary judgment. On July 16, Reasonover moved for reconsideration and filed her opposition to Officer Pruett's motion for summary judgment. The district court denied Reasonover's motion on November 25, 2003. The district court granted all of the remaining defendants' respective motions for summary judgment except for that of Captain Chapman, and denied Reasonover's motion for partial summary judgment. Reasonover and Captain Chapman later settled. Reasonover now appeals the district court's orders granting summary judgment to the various defendants.

## II.    DISCUSSION

We review de novo the district court's grant of summary judgment, viewing all evidence and reasonable inferences in the light most favorable to the nonmoving party. Weyrauch v. Cigna Life Ins. Co. of N.Y., 416 F.3d 717, 719-20 (8th Cir. 2005). We will affirm a "grant of summary judgment 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . .' demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Interstate Cleaning Corp. v. Commercial

---

[3]We refer to Reasonover and her daughter Bufford collectively as "Reasonover."

-10-

Underwriters Ins. Co., 325 F.3d 1024, 1027 (8th Cir. 2003) (quoting Fed. R. Civ. P. 56(c)). "Evidence, not contentions, avoids summary judgment." Mayer v. Nextel West Corp., 318 F.3d 803, 809 (8th Cir. 2003). We may affirm summary judgment for any reason supported by the record, even if it differs from the rationale of the district court. See Brandt v. Davis, 191 F.3d 887, 891 (8th Cir. 1999).

### A.    Officer Pruett

Reasonover argues the district court abused its discretion in granting Officer Pruett's motion for summary judgment without allowing Reasonover sufficient time to respond. Reasonover also claims the district court's order in essence granted a default judgment and violated Reasonover's due process. Finally, Reasonover argues the evidence presented by Officer Pruett, regardless whether Reasonover responded, did not merit granting Officer Pruett summary judgment, because the evidence demonstrated material issues of fact whether Officer Pruett was involved in filing a false police report and suppressing exculpatory evidence.

Reasonover's arguments fail. District courts have broad discretion to set filing deadlines and enforce local rules. See Nw. Bank & Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 724-25 (8th Cir. 2003); Grandson v. Univ. of Minn., 272 F.3d 568, 574 (8th Cir. 2001). According to Federal Rule of Civil Procedure 56(e) and Eastern District of Missouri Local Rule 7-4.01(E), Reasonover had thirty days to respond to Officer Pruett's motion for summary judgment, and if Reasonover failed to respond timely, those matters would be deemed admitted. It was no abuse of discretion for the district court, after diligently working with the parties regarding the filing schedule, to stick to its previously established deadline for Reasonover to respond to Officer Pruett's motion. With Reasonover failing to file a timely response, the district court did not abuse its discretion in deeming facts set forth in Officer Pruett's motion admitted. See E.D. Mo. L.R. 7-4.01(E). Furthermore, Reasonover's argument that the district court's order amounted to a default judgment also is without merit. The

-11-

court considered the admitted facts in light of the relevant law and ruled based on the merits. See Bennett v. Dr Pepper/Seven Up, Inc., 295 F.3d 805, 809 (8th Cir. 2002).

Finally, based on the uncontroverted facts presented in Officer Pruett's motion, summary judgment in favor of Officer Pruett was appropriate. Officer Pruett claims he did not falsely report the information he was provided by members of the Weston family, nor did he conspire with anyone to implicate Reasonover in Buckley's murder, including the prosecuting attorney. Officer Pruett had limited contact with Goldman and did not participate in the criminal trial. The Westons' later testimony notwithstanding, Officer Pruett's factual statements are deemed admitted by Reasonover. Reasonover has therefore failed to show Officer Pruett's conduct deprived her of a constitutional right. See Hamilton v. Schriro, 74 F.3d 1545, 1549 (8th Cir. 1996). Thus, we affirm the district court's order granting Officer Pruett's motion for summary judgment.

## B. Prosecutor Goldman

The district court concluded Goldman was entitled to absolute immunity from liability under 42 U.S.C. § 1983. Reasonover argues the district court erred in finding Goldman (1) acted solely as a prosecutor and not as an investigator regarding his contacts with Jolliff, Hinton, Main, and Lyner; (2) did not act recklessly in conducting his investigation; and (3) was not involved in a conspiracy to convict Reasonover.

A prosecutor enjoys absolute immunity for acts performed "in initiating a prosecution and in presenting the State's case." Imbler v. Pachtman, 424 U.S. 409, 431 (1976). "[F]unctions[] 'intimately associated with the judicial phase of the criminal process[]' as opposed to investigative 'police work' or administrative duties [are] absolutely shielded" from liability under section 1983 claims. Myers v. Morris, 810 F.2d 1437, 1445 (8th Cir. 1987) (quoting Imbler, 424 U.S. at 430), abrogated on other grounds, Burns v. Reed, 500 U.S. 478 (1991). Immunity is not defeated by allegations of malice, vindictiveness, or self-interest. Id. at 1446.

-12-

All of Goldman's acts complained of by Reasonover were prosecutorial functions and therefore are protected. Goldman's contacts with Jolliff in preparing her to testify at trial, and his interviews of Hinton, Main, and Lyner, were all actions associated with prosecuting Reasonover's alleged criminal acts. Reasonover's arguments regarding Goldman's contacts with Lyner are particularly weak. Reasonover claims at one point, given Lyner's extensive criminal background, Goldman should have taken steps to corroborate Lyner's statements beyond a polygraph test–i.e., Goldman should have further investigated Lyner. Reasonover then argues Goldman was divested of his absolute immunity because of his "active[] . . . investigation" of Lyner. Reasonover cannot have it both ways. Regardless, Goldman's interviewing of witnesses, including Lyner, was prosecutorial and not police work. "Not all of an advocate's work is done in the courtroom. For a lawyer to properly try a case, he must confer with witnesses, and conduct some of his own factual investigation." Cook v. Houston Post, 616 F.2d 791, 793 (5th Cir. 1980), quoted in Myers, 810 F.2d at 1450. Even if Goldman knowingly presented false, misleading, or perjured testimony, or even if he withheld or suppressed exculpatory evidence, he is absolutely immune from suit. See Myers, 810 F.2d at 1446.

Finally, a prosecutor is absolutely immune from a civil conspiracy charge when his alleged participation in the conspiracy consists of otherwise immune acts. Rowe v. City of Fort Lauderdale, 279 F.3d 1271, 1282 (11th Cir. 2002); see also Myers, 810 F.2d at 1446. Because Goldman is absolutely immune from liability for prosecuting Reasonover, he cannot be held liable for conspiring to violate Reasonover's constitutional rights by prosecuting her.

-13-

## C. Detective Eichelberger, Officer Banaszek, and Detective Tillman

Reasonover argues the district court erred in finding Detective Eichelberger, Officer Banaszek, and Detective Tillman were not responsible for suppressing the Reasonover-White Tape, feeding information to Jolliff, falsely arresting Reasonover, or conspiring to convict Reasonover wrongfully. The officers respond they are entitled to qualified immunity because they did not violate Reasonover's constitutional rights.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). We analyze the officers' claims to qualified immunity in two steps. Saucier v. Katz, 533 U.S. 194, 201 (2001). We first ask whether the facts, taken in the light most favorable to Reasonover, "show the officer[s'] conduct violated a constitutional right." Id. If there is no violation, the officers are entitled to qualified immunity. If there is a violation, we determine "whether the right was clearly established." Id. Here, we decide qualified immunity at step one, and hold Reasonover fails to show Detective Eichelberger, Officer Banaszek, and Detective Tillman violated Reasonover's constitutional rights. We need not reach whether a right was clearly established.

### 1. Suppressing the Reasonover-White Tape

Reasonover's evidence that the officers suppressed the Reasonover-White Tape consists of the following: all three officers' names were written on the tape, with Detective Eichelberger's name on the side containing the taped conversation; none of the officers documented the conversation or marked the envelope containing the tape to reflect the Reasonover-White conversation; and Goldman later testified an officer misled him about the contents and location of the tape, though Goldman could not name which officer.

Putting aside the issue whether the Reasonover-White Tape constitutes exculpatory evidence under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because there is no specific evidence the officers affirmatively suppressed the tape, we must decide whether these facts create a reasonable inference they did so. <u>See</u> Fed. R. Civ. P. 56(c); <u>Weyrauch</u>, 416 F.3d at 720. With respect to Officer Banaszek and Detective Tillman, the only evidence linking them to the tape is their names on the opposite side of the tape. This limited evidence does not create any inference these officers suppressed the tape. Regarding Detective Eichelberger, the mere fact his name and the date of the conversation were on the side of the tape containing the recording does not create a reasonable inference Detective Eichelberger affirmatively suppressed the tape. While Goldman testified an officer misled him about the tape, at one point suggesting it was Captain Chapman, he never said it was Detective Eichelberger. Detective Eichelberger, as well as Officer Banaszek and Detective Tillman, all deny making the recording or having responsibility for the tape. Names and dates on the tape's label, even taken in a light most favorable to Reasonover, do not raise an inference of unlawful suppression of the tape.

### 2. Feeding Evidence to Jolliff

Reasonover asserts Detective Eichelberger and Detective Tillman fed Jolliff information before interviewing her and used leading questions to elicit the responses they wanted. She points to her claim that Jolliff made certain misstatements of fact that were present in a prior police report (that Reasonover had a son rather than a daughter, and that Buckley had been beaten with the butt of a rifle), and two instances of Detective Eichelberger asking leading questions. Finally, Reasonover claims the habeas court's finding "strong evidence suggesting that Jolliff was given incriminating details to use in her testimony against" Reasonover is relevant to our decision. <u>Reasonover</u>, 60 F. Supp. 2d at 966.

Based on our review of the transcript and record as a whole, we conclude Reasonover has not presented evidence that Detective Eichelberger and Detective

Tillman fed Jolliff answers during their interview of her. First, Detective Tillman was present, but he did not participate in any questioning. Second, Reasonover presents no evidence connecting Detective Eichelberger or Detective Tillman to the prior police report's incorrect statement that Reasonover had a son. Third, contrary to Reasonover's assertions, Jolliff never claimed during the interview that Reasonover told her Buckley had been beaten with the butt of a rifle. Finally, the information Reasonover claims Detective Eichelberger supplied through the use of leading questions arose only in response to Jolliff first raising the particular issue. Detective Eichelberger told Jolliff the name of Reasonover's ex-boyfriend only after she referenced him without using his name. Detective Eichelberger asked Jolliff if Reasonover admitted to using a rifle only after she made reference to a rifle. Furthermore, the information Jolliff appears to know about the murder may have come not from the officers, but from her having seen television reports on the case: "Well, it was supposed to be a rifle involved. . . . I had heard about it on TV." While we do not commend Detective Eichelberger's use of leading questions as an interview technique under these circumstances, the facts presented by Reasonover do not raise a genuine issue that Detective Eichelberger intentionally fed or planted evidence.

### 3. False Arrest

Reasonover's false arrest claim, that an officer in the position of the officers could not have reasonably believed they had probable cause to place Reasonover under arrest for Buckley's murder, is dependent on her allegations that the officers suppressed the Reasonover-White Tape, fed Jolliff information for her interview, and Officer Banaszek created a false report regarding the January 7, 1983, interview with Reasonover. As demonstrated above, the first two allegations lack merit. Regarding the third allegation, Reasonover only claims the report should have contained her denials of involvement in the murder. Reasonover cites no case law, and we are unaware of any case law, holding it is a violation of a suspect's constitutional rights if a police report does not contain the entirety of a suspect's denials of involvement in the suspected crime. As a result, this claim fails.

### 4.      Conspiracy

To advance past the summary judgment stage, Reasonover must "allege with particularity and specifically demonstrate material facts that the defendants reached an agreement." Marti v. City of Maplewood, 57 F.3d 680, 685 (8th Cir. 1995). While those allegations may include circumstantial evidence, see Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970), Reasonover presents no specific material facts, circumstantial or otherwise, that the officers formed an agreement to violate Reasonover's constitutional rights. The officers may have jointly pursued their investigation based on a belief Reasonover was guilty, but this does not constitute an unlawful conspiracy. See Myers, 810 F.2d at 1452-53.


### D.      St. Louis Board of Police Commissioners

Reasonover challenges the district court's grant of summary judgment on her claim brought under Monell v. Department of Social Services of New York, 436 U.S. 658 (1978), contending the St. Louis Board of Police Commissioners (Board) failed to train officers properly who were members of the MCS. See City of Canton v. Harris, 489 U.S. 378 (1989). Reasonover offers expert testimony opining the MCS and its constituent police departments offered "little or no training or supervision with regard to the documentation or disclosure of exculpatory evidence."


Under Monell, "a municipality may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional municipal policy or custom." Mettler v. Whitledge, 165 F.3d 1197, 1204 (8th Cir. 1999) (citing Monell, 436 U.S. at 694). To establish liability, Reasonover must prove a Board custom or policy was the moving force behind the constitutional violation. Id. "Before a municipality can be held liable . . . there must be an unconstitutional act by a municipal employee." Russell v. Hennepin County, 420 F.3d 841, 846 (8th Cir. 2005).

Reasonover bases her <u>Monell</u> claim on the alleged unlawful acts by Detective Eichelberger, Officer Banaszek, and Detective Tillman. Her argument fails because she has not shown an unconstitutional act by any Board employee. As discussed above, neither the evidence nor reasonable inferences therefrom demonstrate any of the officers intentionally acted or conspired to act to withhold or plant evidence or to convict Reasonover wrongfully.[4] We therefore affirm the district court's grant of summary judgment to the Board on Reasonover's section 1983 claim.

### E.    Officer Welling

Reasonover argues Officer Welling's failure to document Reasonover's denials of involvement in Buckley's murder during Reasonover's interview with Officer Welling and Officer Banaszek, and Officer Welling's failure to disclose the Reasonover-White Tape, violated Reasonover's constitutional rights. Regarding Reasonover's interview, Officer Welling is entitled to qualified immunity for the same reason Officer Banaszek is entitled to qualified immunity. Again, a suspect's constitutional rights are not violated if a police report does not contain the entirety of a suspect's denials of involvement in the suspected crime. Regarding the Reasonover-White Tape, Officer Welling is entitled to qualified immunity for the same reason Detective Eichelberger, Officer Banaszek, and Detective Tillman are entitled to qualified immunity. Reasonover has not produced evidence Officer Welling intentionally withheld or destroyed evidence. Regarding conspiracy, Reasonover's argument fails because she presents no specific material facts, circumstantial or otherwise, that Officer Welling and other officers formed an agreement to violate Reasonover's constitutional rights. See <u>Marti</u>, 57 F.3d at 685.

---

[4]Because we hold Reasonover fails to show any unconstitutional acts by Board employees, we need not reach the issue whether the Board had an unconstituional policy or custom, nor need we discuss Reasonover's expert's testimony claiming the MCS lacked adequate policies on training and supervising employees as to the collection and disclosure of evidence.

### F.    St. Louis County

Reasonover argues St. Louis County is liable under <u>Monell</u> for failing to train its employees properly, including Officer Welling and Goldman.  She claims St. Louis County failed to train or supervise Officer Welling on his duties in disclosing <u>Brady</u> materials to the prosecutor, and failed to train or supervise Goldman on his obligations under <u>Brady</u> to disclose exculpatory materials to the defense.  To establish her claim, Reasonover must show St. Louis County's failure to train or supervise "amounts to deliberate indifference to the rights of persons with whom the police come into contact" and the failure is the "moving force behind the constitutional violation." <u>Harris</u>, 489 U.S. at 388, 389 (quotation omitted).

We agree with the district court that Reasonover presented insufficient evidence of inadequate training or supervision by St. Louis County of its employees.  Officer Welling stated in his affidavit that when he joined the Buckley murder investigation, he knew he was required to secure and deliver to the prosecutor all evidence relating to the crime, including exculpatory evidence.  Goldman stated in his affidavit that before the investigation of Reasonover, he knew of his obligation to disclose exculpatory evidence to the defense.  Goldman further stated it was the policy of the St. Louis County Prosecuting Attorney's office to disclose all <u>Brady</u> materials.  These testimonies are all case facts from the unchallenged findings by the district court.  Thus, Reasonover fails to demonstrate Officer Welling's and Goldman's alleged violations of Reasonover's rights were the result of inadequate training or supervision by St. Louis County.

We further agree with the district court that Reasonover fails to show St. Louis County had an unconstitutional custom of failing to document exculpatory evidence. <u>See</u> <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." (citation

omitted)). Reasonover presents no evidence of a widespread practice of violating police and prosecutorial obligations under Brady.

### G. Officer Needham

Reasonover argues Officer Needham wrongfully pressured Hinton to testify in support of Jolliff's claim that Reasonover confessed while in jail. The district court found the only evidence on the issue demonstrates Officer Needham was not present during the interview of Hinton. We agree with this finding. The only evidence even suggesting Officer Needham was present is an MCS report stating Officer Needham, along with other officers, "proceeded to the Prosecuting Attorney's office . . . where . . . Goldman interviewed Marquita Butler [Hinton]." Goldman's notes of the interview do not mention Officer Needham's presence, and Officer Needham denies being present. Reasonover also argues Officer Needham acted in concert with Detective Eichelberger and Detective Tillman in feeding Jolliff information for her statement. Again, for the same reasons Reasonover did not show Detective Eichelberger and Detective Tillman fed Jolliff answers, Reasonover has not shown Officer Needham fed Jolliff answers. We therefore affirm the district court's grant of summary judgment to Officer Needham.

### H. City of Jennings

As with the Board and St. Louis County, Reasonover asserts a claim under Monell that the City of Jennings failed to train its employees properly. Again, Reasonover fails to show City of Jennings employee Officer Needham violated her constitutional rights; thus, the City of Jennings is not liable under Monell. See id.

### I. Dr. Lum

Reasonover argues Dr. Lum was a state actor and therefore liable under section 1983. The district court found Dr. Lum was not a state actor and therefore granted Dr. Lum summary judgment. We agree with the district court.

A private party may be deemed a state actor for purposes of section 1983 liability when he acts under cover of state law and performs a function "traditionally exclusively reserved to the state." Jackson v. Metro. Edison Co., 419 U.S. 345, 352 (1974). Reasonover points to Dr. Lum's 200 hypnosis sessions for the police over his seventeen years in private practice as evidence of state action, but cites no case law explaining why Dr. Lum should be considered a state actor, nor any case law asserting hypnosis is a traditional state function. We do not consider a psychiatrist in private practice who occasionally (on average about once a month) performs hypnosis sessions at the request of law enforcement, not under contract and sometimes without compensation, to be a state actor for purposes of liability under section 1983. We therefore affirm the district court's grant of summary judgment to Dr. Lum on Reasonover's section 1983 claim.

## J.    Familial Association Claim

Reasonover argues the defendants violated her right to familial association as a result of her incarceration, relying on the recognition of that general right in City of Dallas v. Stanglin, 490 U.S. 19, 24 (1989). Addressing first whether there was a violation of a constitutional right, see Saucier, 533 U.S. at 201, we conclude there is insufficient evidence to show defendants violated Reasonover's alleged right to familial association. "A defendant can be held liable for violating a right of intimate association only if the plaintiff shows an intent to interfere with the relationship." Singleton v. Cecil, 133 F.3d 631, 635 (8th Cir. 1998) (quoting Morfin v. Albuquerque Pub. Sch., 906 F.2d 1434, 1440 (10th Cir. 1990)), cited with approval in Singleton v. Cecil, 176 F.3d 419, 423 (8th Cir. 1999) (en banc). Reasonover presents no evidence the defendants had an intent to interfere with the relationship between Ellen Reasonover and her daughter. Even if Reasonover did present such evidence, we agree with the district court's finding that any right to familial association was not sufficiently clear such that the defendants reasonably could have understood they were violating it. Neither the Supreme Court nor this court has clearly held wrongful

prosecution and incarceration of a family member violates a right to familial association.

### K. State Law Claims
#### 1. Prosecutor Goldman

Under Missouri law, prosecutors are entitled to absolute immunity from tort claims. State ex rel. Griffin v. Smith, 258 S.W.2d 590, 593 (Mo. 1953) (en banc), overruled on other grounds, State v. Honeycutt, 96 S.W.3d 85 (Mo. 2003) (en banc). As discussed above, Goldman's acts challenged by Reasonover were all performed as a function of his prosecuting Reasonover. Goldman is therefore entitled to absolute immunity against Reasonover's state law claims.

#### 2. Detective Eichelberger, Detective Tillman, Officer Banaszek, Officer Welling, and Officer Needham
##### a. Negligence

Under Missouri law, the official immunity doctrine protects public officials from liability for injuries arising out of their discretionary acts or omissions, but not from liability in claims arising from their performance of ministerial acts. Bryan v. Mo. State Highway Patrol, 963 S.W.2d 403, 406 (Mo. Ct. App. 1998). "However, official immunity is a qualified immunity and does not apply to those discretionary acts done in bad faith or with malice." Davis v. Bd. of Educ. of St. Louis, 963 S.W.2d 679, 688 (Mo. Ct. App. 1998). The investigation of a crime is a discretionary act, not a ministerial one. Cf. Beaver v. Gosney, 825 S.W.2d 870, 874 (Mo. Ct. App. 1992). Putting aside her numerous unsupported contentions, we conclude Reasonover presents no specific evidence of bad faith on the part of any of the officers. We therefore affirm the district court's conclusions that Detective Eichelberger, Detective Tillman, Officer Banaszek, Officer Welling, and Officer Needham are entitled to official immunity and therefore summary judgment on Reasonover's negligence claim.

### b.      False Arrest

Notwithstanding the applicable statute of limitations, <u>see</u> Mo. Rev. Stat. § 516.130 (establishing three-year limitations period for actions against public officers), Reasonover's state law claim for false arrest fails for the same reason her section 1983 claim fails. The allegations upon which her false arrest claim rest (the officers suppressed evidence, fed Jolliff information, and created a false report) are unsupported in the record. We therefore affirm the district court's grant of summary judgment to Detective Eichelberger, Detective Tillman, Officer Banaszek, Officer Welling, and Officer Needham on Reasonover's state law false arrest claim.

### c.      Malicious Prosecution

To establish malicious prosecution, Reasonover must show, *inter alia*, the absence of probable cause for her prosecution. <u>See</u> <u>Sanders v. Daniel Int'l Corp.</u>, 682 S.W.2d 803, 807 (Mo. 1984) (en banc). Reasonover's claim again depends on her allegations officers suppressed evidence, planted evidence, and filed a false report. As demonstrated above, these allegations lack support in the record. We therefore affirm the district court's grant of summary judgment to Detective Eichelberger, Detective Tillman, Officer Banaszek, Officer Welling, and Officer Needham on Reasonover's state law malicious prosecution claim.

### d.      Abuse of Process

To establish her abuse of process claim, Reasonover must present evidence demonstrating, *inter alia*, the officers had an improper purpose in exercising illegal, improper, or perverted use of process. <u>See</u> <u>Duvall v. Lawrence</u>, 86 S.W.3d 74, 84-85 (Mo. Ct. App. 2002). Here, there is no evidence the officers had any motive in investigating Reasonover other than prosecuting her for Buckley's murder. We therefore affirm the district court's grant of summary judgment to Detective Eichelberger, Detective Tillman, Officer Banaszek, Officer Welling, and Officer Needham on Reasonover's state law abuse of process claim.

### 3. St. Louis Board of Police Commissioners, St. Louis County, and the City of Jennings

Reasonover seeks to hold the governmental entities vicariously liable for the wrongful acts of their respective employees. Under Missouri law, with certain exceptions not applicable here, sovereign immunity shields governmental entities from liability in tort. Mo. Rev. Stat. § 537.600. We therefore affirm the district court's grant of summary judgment to the St. Louis Board of Police Commissioners, St. Louis County, and the City of Jennings on Reasonover's state law claims.

### 4. Dr. Lum
#### a. Collateral Estoppel and Negligence Claim

Reasonover claims Dr. Lum was negligent in hypnotizing Main, because Dr. Lum "knew or should have known that hypnotically induced identifications lack reliability." Reasonover argues the district court erred in concluding she is collaterally estopped from relitigating this issue, because it was decided by the Missouri Court of Appeals on Reasonover's direct appeal of her conviction. See Reasonover, 714 S.W.2d at 721. Reasonover also argues collateral estoppel does not apply to her co-plaintiff and daughter Bufford, because Bufford was not a party to the direct appeal. We need not determine the collateral estoppel effect of that previous decision because we hold there is no genuine issue of material fact whether Dr. Lum was negligent in conducting his hypnosis of Main.

Reasonover's evidence that Dr. Lum was negligent consists of the following: (1) after the hypnosis session, Main was more confident of his identification of White; (2) Officer Pruett and Dr. Lum deny having a conversation about the details of the case before the hypnosis session, but Officer Pruett admits "brief[ing] Dr. Lum of the circumstances surrounding the incident"; and (3) the transcript of the hypnosis session suggests Dr. Lum knew details about the case and Dr. Lum "intentionally cemented Main's tentative identification of White." The transcript includes the following passages: Dr. Lum brought up the initial photographic lineup without it being

mentioned by Main; after Main stated he "glanced up" at White's face, Dr. Lum asked "You had a pretty good look at the face didn't you?"; Dr. Lum closed the hypnosis session by admonishing Main to "let the Detectives know . . . if you can help identify any . . . guys," and again asked Main "[w]hy aren't you positive?"

Reasonover argues this evidence presents a genuine issue of material fact whether Dr. Lum negligently and in a conspiracy with Officer Pruett and other officials suggested Main identify White as the person he saw at the Vickers station, suggesting Dr. Lum helped manufacture evidence used wrongly to convict Reasonover. We do not agree. The parties do not provide, and we do not find, any Missouri case law enunciating the standard of care a psychiatrist practicing hypnosis must follow to avoid being liable for negligence, beyond the general standard for physicians in the context of a malpractice claim: "[A] physician is required to use and exercise that degree of care and skill used and exercised by the ordinarily skillful, careful and prudent physician acting under the same or similar circumstances." Williams v. Chamberlain, 316 S.W.2d 505, 510 (Mo. 1958). Given this dearth of state law, we must turn to Missouri law on admissibility of post-hypnotic testimony. Under Missouri law, at the time of Reasonover's trial, post-hypnotic testimony was admissible, absent a showing of impermissible suggestiveness. State v. Greer, 609 S.W.2d 423, 435-36 (Mo. Ct. App. 1980), vacated on other grounds, Missouri v. Brown, 450 U.S. 1027 (1981).[5] This admissibility rule suggests a hypnotist's duty is to refrain from impermissibly suggesting responses to a hypnotized witness.

---

[5]The Missouri Supreme Court later held hypnotically refreshed testimony is per se excluded because it lacks scientific support for its reliability. Alsbach v. Bader, 700 S.W.2d 823, 830 (Mo. 1985) (en banc). That later holding is not applicable to determining Dr. Lum's standard of care in 1983. See Reasonover, 714 S.W.2d at 720 (holding Alsbach created a new rule of law that is to be applied prospectively).

The evidence in the record does not present a triable issue whether Dr. Lum was impermissibly suggestive. The fact Officer Pruett and Dr. Lum discussed the case before the hypnosis, during which Officer Pruett apparently told Dr. Lum about Main's previous identification, does not raise a genuine issue of any illicit agreement between Dr. Lum and the police. It merely demonstrates Dr. Lum's preparations for the hypnosis session. More importantly, Dr. Lum states he was not told the identities of Reasonover or White, and Reasonover provides no evidence to the contrary. Finally, contrary to Reasonover's claims, the transcript of the session does not show Dr. Lum suggested who Main should identify. Dr. Lum did not know White's identity; thus, he could not steer Main toward identifying White. The questions Dr. Lum asks that might be construed as leading Main to identify White often prompt responses different than those suggested. For example, at one point Dr. Lum asks whether the person Main saw had a "[s]hort neck, or thick neck," to which Main responds, "It was a slender neck . . . kind of long." Dr. Lum's questioning whether Main "had a pretty good look at the face" and why Main wasn't "positive" about the identification does not show any suggestion, let alone impermissible suggestion. For these reasons, we affirm the district court's grant of summary judgment to Dr. Lum on Reasonover's state law negligence claim.

### b.      Remaining State Law Claims

Reasonover also claims Dr. Lum's actions instigated Reasonover's false arrest, Dr. Lum helped cause Reasonover to be prosecuted without probable cause, and Dr. Lum had an improper purpose leading to an improper use of process against Reasonover. There is no evidence Dr. Lum encouraged Reasonover's arrest aside from his non-negligent participation in hypnotizing one witness, Dr. Lum encouraged the prosecutor to initiate prosecution against Reasonover, or Dr. Lum had an improper purpose in hypnotizing Main. For these reasons, we affirm the district court's grant of summary judgment to Dr. Lum on Reasonover's state law false arrest, malicious prosecution, and abuse of process claims.

-26-

## III.  CONCLUSION

In summary, we affirm the district court's orders granting summary judgment in favor of the defendants.

———————————————